Filed 5/3/13  P. v. Perez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E053474 |
| v. | (Super.Ct.No. RIF10004062) |
| JOSE LUIS RAMIREZ PEREZ, | OPINION |
| Plaintiff and Respondent. | |

APPEAL from the Superior Court of Riverside County.  Mark E. Johnson, Judge.

Affirmed.

David M. Morse, under appointment by the Court of Appeal, for Defendant and

Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney

General, Julie L. Garland, Assistant Attorney General, Michael T. Murphy and Donald

W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Jose Luis Ramirez Perez is serving a prison term of 39 years to life,

after a jury convicted him of all five charges resulting from his numerous rapes of his

1

stepdaughter over a period spanning approximately ten years.  Defendant argues his conviction for forcible rape, which occurred after his stepdaughter turned 18, should be reversed because the trial court should have, *sua sponte,* instructed the jury on the defense of reasonable belief in consent.  As discussed below, we affirm the conviction.

## FACTS AND PROCEDURE

Defendant is Jane Doe's stepfather and the father of her three brothers.  Defendant began living with the family when Jane Doe was in elementary school.  Defendant was the disciplinarian in the house.  Jane Doe testified that when she was in elementary school defendant would hit her in the head with a closed fist when she would get in trouble.  Another time when she was in junior high he hit her with a belt after she broke a statue.  She hated him for hitting her as she was growing up.  Defendant would also beat Jane Doe's mother in front of her.  Jane Doe testified she was "scared of" defendant.

Defendant started sexually abusing Jane Doe when she was 10 or 11 years old.  Defendant would make Jane Doe undress and then he would rub lotion all over her body, including her private parts.  He sodomized her many times over the years, sometimes more than once in a day.  Jane Doe did not like this and would try to move, but defendant would get angry and tell her to "hold still."  The frequent sodomy would cause Jane Doe to bleed.  Beginning when Jane Doe was in 7th or 8th grade, defendant began to orally copulate Jane Doe.  When she was in 8th grade defendant began to vaginally rape Jane Doe.  The sexual abuse continued regularly and frequently throughout Jane Doe's time in high school and until she was 20 years old.

Jane Doe learned about the human body during class at middle school, and that was when she first knew that what defendant was doing was wrong. She did not say anything to defendant because she was "scared." When asked why she did not tell her mother at this time, Jane Doe testified that she was both scared of defendant and afraid her mother would not believe her.

As Jane Doe got older, she stopped crying or trying to get away from defendant during the abuse, as she had sometimes done when she was younger, because "I just thought it would be better to just let him do what he wanted so he wouldn't get angry." Jane Doe testified that defendant has a temper, and that when he lost his temper he would raise his voice to her mother and hit her mother and throw things.

During Jane Doe's senior year in high school, her mother and defendant lost their house in Corona to foreclosure. Defendant moved back to Orange County and Jane Doe, her mother and her brothers moved in with her grandmother.

Jane Doe turned 18 during her senior year in high school. She quit high school to work full time at her fast food job. She testified: "I just couldn't wait to be 18 so I could move out of the house and be away from him." However, Jane Doe did not move out because defendant told her that if she did move, he would not allow her to see her two youngest brothers, ages seven and four. Later, when Jane Doe was age 18 or 19, defendant also told her that if she did not want to continue having sex with him, she would have to pay back all the money he had spent raising her.

In December of 2007, when Jane Doe was 18 years old, there was an altercation between defendant, Jane Doe, and her mother. At that time defendant and Jane Doe's

mother were separated. As they were leaving an animal shelter, defendant wanted Jane Doe to ride with him in his car rather than in her mother's car. Jane Doe refused and locked herself in her mother's car. Defendant became angry and aggressive. He took a knife out of his pocket and banged it against the car window in an effort to break it. Jane Doe ran out the back of the car and into the animal shelter. She told one of the employees about how defendant had been abusing her since childhood. She also told her mother for the first time. Her mother called defendant on her cell phone and asked defendant why he had done it. She then told Jane Doe to speak with defendant on the phone. Defendant was very angry and said that he was going to kill Jane Doe. She took the threat seriously. The animal shelter employee called police. Jane Doe was interviewed by police officers. They asked Jane Doe to place a pretext call to defendant so they could record him talking about the abuse, but Jane Doe was too afraid to do it. Jane Doe did not follow up with additional efforts by the police to contact her.

After the day at the animal shelter, defendant ceased abusing her for about a month. Defendant would call Jane Doe's mother and her mother would try to get her to talk to defendant so he could apologize. Eventually Jane Doe agreed to meet defendant at a gas station so he could tell her how sorry he was. He then talked her into following him back to his home in Orange. Either that time or shortly afterward, defendant began abusing Jane Doe again. Jane Doe testified that she was afraid defendant would kill her if she did not go along, because he had threatened to do so when he found out she had reported him to the police and told her mother.

4

When Jane Doe was 19 years old she told defendant she was going to move to Texas. He told her that if she did she would never see her brothers again. Also when Jane Doe was 19 she told defendant that she did not want to continue having sex with him. He told her if she did not he would get her fired from her fast food job. The job was very important to Jane Doe—she left high school to work full time at that job and had continued to work there for five years. He also continued telling her that if she did not want to continue having sex with him he would make her pay back everything he had spent on her growing up. When she was 20 years old, defendant threatened to have her mother's car repossessed. Also at about that time defendant threatened to send some guys over to Jane Doe's boyfriend's house to beat him up if she did not continue having sex with defendant.

The last time defendant and Jane Doe had sex was on November 28 or 29, 2009. Jane Doe testified that she had gone to his apartment and they were talking on the couch. Defendant told her she need to accept how things were, that they needed to go back to the way they had been before, and that she had five minutes to decide. Jane Doe eventually agreed and they went into the bedroom and had sex. She did not want to. The same thing happened the next day.

On December 1, 2009, Jane Doe had a relative take her to the sheriff's department to report the abuse. During the interview, defendant texted Jane Doe 10 to 20 times with messages such as "Don't do anything stupid" and "No matter where you go or what you do, you know I'm watching you." The deputy had Jane Doe place a pretext call to appellant in which he admitted to having abused her, but claimed it was not until she was

5

14 years old, and asked for forgiveness. A tape recording of this call was played for the jury. The jury also heard a recording of defendant's police interview in which he admitted to sodomizing Jane Doe, but claimed it happened when she was about 14 years old. He also admitted to having sex with her, but claimed it happened when she was 16 years old. He also admitted to having told Jane Doe that he had friends who could get information about her boyfriends, but stated he just wanted to scare her so she would not talk to them. Defendant stated that he had had sex with Jane Doe twice in his current apartment, where he had lived for about one month.

On January 7, 2011, the People filed a second amended information charging defendant in counts 1 and 2 with aggravated sexual assault of a child under age 14 (Pen. Code, § 269, subd. (a)(3)),[1] in count 3 with a lewd and lascivious act on a child under age 16 (§ 288, subd. (c)(1)), in count 4 with sodomy on a child under age 16 (§ 286, subd. (b)(2)), and in count 5, forcible rape (§ 261, subd. (a)(2)).

On January 14, 2011, the jury found defendant guilty on all counts.

On April 29, 2011, the trial court sentenced defendant to a determinate prison term of nine years and four months, to be followed by an indeterminate term of 30 years to life, as follows: the upper term of eight years on count 5, plus eight months consecutive on count 3 and eight months consecutive on count 4, to be followed by 15 years to life on count 1 and a consecutive term of 15 years to life on count 2. This appeal followed.

---

[1] All section references are to the Penal Code unless otherwise indicated.

DISCUSSION

Defendant contends that, as to the forcible rape charge, the trial court prejudicially erred by failing to give the jury, sua sponte, the portion of Judicial Council of California Criminal Jury Instruction, CALCRIM No. 1000, the instruction on forcible rape, that sets forth the defense of reasonable belief in consent. Specifically, he argues there was substantial evidence to support a finding that defendant maintained a reasonable and good faith, albeit mistaken, belief that Jane Doe consented to each act of sexual intercourse that took place between December 2007 and December 2009, after she became 18 years old. The portion of CALCRIM No. 1000 at issue is as follows: "The defendant is not guilty of rape if he actually and reasonably believed that the woman consented to the intercourse. The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the woman consented. If the People have not met this burden, you must find the defendant not guilty."

"[A] defendant's reasonable and good faith mistake of fact regarding a person's consent to sexual intercourse is a defense to rape. [Citation .]" (*People v. Williams* (1992) 4 Cal.4th 354, 360 (*Williams*).) "The . . . defense has two components, one subjective, and one objective. The subjective component asks whether the defendant honestly and in good faith, albeit mistakenly, believed that the victim consented to sexual intercourse. . . . [¶] . . . [T]he objective component . . . asks whether the defendant's mistake regarding consent was reasonable under the circumstances." (*Id*. at pp. 360-361, fn. omitted.) "[I]n determining whether [an] instruction [on this defense] should be given, the trial court must examine whether there is substantial evidence that the

7

defendant honestly and reasonably, but mistakenly, believed that the victim consented to sexual intercourse." (*Id*. at p. 361.) " . . . [T]he instruction should not be given absent substantial evidence of equivocal conduct that would have led a defendant to reasonably and in good faith believe consent existed where it did not." (*Id*. at p. 362.)

In this case, despite defendant's arguments to the contrary, substantial evidence was not presented to warrant an instruction on reasonable belief in consent. In other words, the record does not show the kind of equivocal conduct on the part of the victim to merit the challenged instruction.

We examine the record for substantial evidence of equivocal conduct leading up to the final incident at defendant's Riverside apartment in November 2009, including the evidence to which defendant points in his appellate briefs. First, defendant points to Jane Doe's testimony that she would send defendant text messages saying that she liked him, that she wanted to see him, that she had "desires". However, Jane Doe was very clear on the witness stand that she sent these messages only because defendant told her he wanted to receive messages like this from her. "Because there were times where he would tell me, How come I never hear from you, that he wanted—so he told me that he wanted to start hearing things like that from me." When asked why she did as he told her she answered, "'Cause I didn't want to get him angry or just have him be mad at everybody.'" Defendant points to his statements in his interview with police that defendant would send him such texts, including naked pictures of herself, and that she had told him in person that she wanted to be with him, but that he had told her he was

8

still with her mother.  The trial court was entitled to ignore these self-serving statements that were made, not even as a witness under oath, but during an interview with police.

Second, defendant points to Jane Doe's testimony that she had once discussed with defendant going Christmas shopping together and what he was going to get her for Christmas.  We hardly think such a discussion can reasonably be taken in good faith as consent to intercourse.

Third, defendant points to Jane Doe's testimony regarding an incident, just prior to the first time she reported the sexual abuse in December 2007, where defendant asked her to have sex with him in the back of her car in a parking lot after she finished work, and she had said, "Well, I don't care, whatever."  Based on the relationship between defendant and Jane Doe at that point—that he had for years been raping her and physically punishing her when she did not comply—one could not reasonably conclude from Jane Doe's description of the events that a reasonable person in defendant's position would have believed she freely consented to the intercourse.  A reasonable inference can be made that refusing his advances would bring retribution to Jane Doe in the form of continued physical punishment.

Finally, Jane Doe's testimony about the threats defendant resorted to in the later years of the abuse makes it clear that defendant knew, subjectively and objectively, that he could only obtain her participation in their sexual acts by use of coercion.  As Jane Doe testified, defendant threatened to cut off contact with her beloved little brothers, to get her fired from her long-time fast food job upon which she depended for her livelihood, to make her pay back the money he had spent on her support as a child, to

9

have her mother's car repossessed, and to have some guys go over and beat up her boyfriend. These threats are plainly acts of coercion, and belie any claim that defendant reasonably believed Jane Doe had sex with him willingly.

The evidence here is not the sort of equivocal conduct referred to in *Williams* that could reasonably and in good faith have been relied upon to form a mistaken belief on defendant's part of Jane Doe's consent to the acts of sexual intercourse. Our review of the record shows no substantial evidence of equivocal conduct warranting an instruction as to reasonable and good faith, but mistaken, belief of consent to that act.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
                                                                    P. J.


We concur:

McKINSTER
                    J.

CODRINGTON
                    J.

10